**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JEWEL LEE DOHERTY, as Executor of the ESTATE OF JEWEL FLETCHER HUFF, Deceased | |
| Plaintiff, | Civil Action No.    23-1772 |
| v. | **JURY TRIAL DEMANDED** |
| INDIANA COUNTY, PENNSYLVANIA, as owner and operator of THE COMMUNITIES AT INDIAN HAVEN, a skilled nursing facility; THE COMMUNITIES AT INDIAN HAVEN, INC.; and AFFINITY HEALTH SERVICES, INC. | |
| Defendants. | |

## PLAINTIFF'S COMPLAINT IN CIVIL ACTION

AND NOW, comes the Plaintiff, Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased, by and through her undersigned counsel, Colin M. Esgro, Esq. and Murray, Stone & Wilson, PLLC, and hereby files the following Complaint in Civil Action against Defendants, Indiana County, Pennsylvania, as the owner and operator of the skilled nursing facility doing business as The Communities at Indian Haven, and The Communities at Indian Haven, Inc, for violations of the duties imposed upon them under the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. § 1396r, *et seq.*, and the implementing regulations found at 42 C.F.R. § 483, *et seq.*, and for violations of the Constitution of the United States of America under Amendment Fourteen, enforceable under 42 U.S.C. § 1983; and against Defendant Affinity Health Services for medical and direct corporate negligence in the management and operation of the skilled nursing facility doing business as The Communities at Indian Haven.

1

## I.     Nature of Action

1.      This is a proceeding under 42 U.S.C. § 1983 to remedy deprivations of rights under the Omnibus Budget Reconciliation Act of 1987, the Federal Nursing Home Reform Act, the Federal Nursing Home Regulations, as found at 42 C.F.R. § 483, which amplify the aforementioned statutes, and the Constitution of the United States of America.

2.      This is also a proceeding asserting intricately related claims to the federal question presented above against Affinity Health Services, Inc.

## II.     Parties

### A.     Plaintiff

3.      Plaintiff, Jewel Lee Doherty is the daughter of Jewel Fletcher Huff, deceased, and is the personal representative of the Estate of Jewel Fletcher Huff.

4.      Plaintiff, Jewel Lee Doherty is an adult individual and citizen of the Commonwealth of Virginia, residing at 3 Dudley Court, Sterling, Viginia 20165.

5.      Jewel Fletcher Huff was a resident of the skilled nursing facility doing business as The Communities at Indian Haven between October 4, 2021, and October 17, 2021.

6.      Jewel Fletcher Huff died on October 24, 2021.

7.      Jewel Fletcher Huff was a resident of Virginia at the time she traveled to Pennsylvania in the summer of 2021 to spend time with family.

8.      On June 26, 2023, Jewel Lee Doherty was appointed as Executor of the Estate of Jewel Fletcher Huff, deceased, by the Probate Department of the County of Loudoun, Commonwealth of Virginia.

9.      Thereafter, on October 3, 2023, Jewel Lee Doherty was granted ancillary letters testamentary by the Register of Wills of Indiana County, Pennsylvania to act as the personal representative of the Estate of Jewel Fletcher Huff, deceased.

10.     Jewel Lee Doherty brings this action as the Executor of the Estate of Jewel Fletcher Huff, deceased, and on behalf of all those entitled by law to recover damages for the wrongful death of Jewel Fletcher Huff.

11.     The name and addresses of all persons legally entitled to recover damages for the wrongful death of Jewel Fletcher Huff, pursuant to the Pennsylvania Wrongful Death Act of 42 Pa. Const. Stat. § 8301, which these causes of action borrow from, of Jewel Fletcher Huff and their relationship to her as follows:

  a.     Jewel Lee Doherty, 3 Dudley Court, Sterling, Viginia 20165 (adult daughter)

  b.     Thomas F. Huff, 107 Thousand Oaks Circle, Goose Creek, South Carolina 29445 (adult son)

### B.     Defendants

12.     Defendant, Indiana County is a governmental agency with its governmental offices located at 825 Philadelphia Street, Indiana, Pennsylvania, 15701.

13.     Defendant, Indiana County, Pennsylvania, as a governmental agency, was acting under the color of state law at all times relevant hereto.

14.     Defendant, Indiana County, Pennsylvania, owns and operates Defendants, The Communities at Indian Haven, and The Communities at Indian Haven, Inc. (hereinafter "Indian Haven), which is a skilled nursing facility located at 1675 Saltsburg Avenue, Indiana Pennsylvania 15701.

15.     As Defendant Indian Haven is owned and operated by Defendant Indiana County, Pennsylvania, Defendant Indian Haven is proper party-Defendant and liable to Plaintiff for civil rights violations that took place at Indian Haven.

16.     At all times relevant hereto, Defendant Indian Haven operated as a "long term care nursing facility" as that term is defined in 35 P.S. § 448.802(a).

3

17.     At all times relevant hereto, Defendant Indian Haven operated as a "skilled nursing facility" as that term is defined in 42 U.S.C. § 1395i-3.

18.     At all times relevant hereto, Defendant Indian Haven was acting under the control of Defendant Indiana County, Pennsylvania, and by and through its duly authorized agents and/or employees who then and there acting within the course and scope of their employment.

19.     Defendant Indiana County, Pennsylvania is a county government organized and existing under the laws of this Commonwealth of Pennsylvania. At all times relevant hereto, Defendant Indiana County, Pennsylvania, acting through Defendant Indian Haven, was responsible for the policies, practices, supervision, implementation and conduct of all matters pertaining to the Defendant Indian Haven and was responsible for the appointment, training, supervision, and conduct of all Defendant Indian Haven personnel.

20.     In addition, at all relevant times, Defendant Indiana County, Pennsylvania was responsible for enforcing the rules of Defendant Indian Haven's facility and for ensuring that personnel employed in Indian Haven's facility obey the Constitution and laws of the United States and of the Commonwealth of Pennsylvania.

21.     Defendant, Affinity Health Service, Inc. is a corporation, duly licensed, organized and existing under and by virtue of the laws of Pennsylvania, with offices and a principal place of business located at 942 Philadelphia Street, Indiana, Pennsylvania 15707.

22.     At all times relevant hereto, Defendant, Affinity Health Services, Inc. (hereinafter "Affinity") was the management company of the Indian Haven facility.

23.     At all times relevant hereto, Affinity, either directly or through its duly authorized agents and/or employees, managed and operated Indian Haven, providing healthcare, medical services, administrative services, therapy, rehabilitation, skilled nursing care, custodial care and nursing services supervision to the residents of Indian Haven.

24.     At no point has suit been brought by or on behalf of Jewel Fletcher Huff either for

4

her personal injuries or for her wrongful death.

25.     At all times relevant hereto, Jewel Fletcher Huff was a recipient of Medicare benefits pursuant to 42 U.S.C.A. § 1395, et seq.

### III.     Jurisdiction and Venue

26.     Jurisdiction is proper in this forum as the instant matter arises under Federal Law and involves a federal question, pursuant to 28 U.S.C. § 1331.

27.     Further, jurisdiction is proper for the entire civil action as the additional claims presented by Plaintiff are intricately related to the claims in this action presenting a federal question that they form part of the same case and/or controversy in accordance with 28 U.S.C. § 1367.

28.     In addition, jurisdiction is proper in this matter as between the Plaintiff and Defendant, Affinity based on diversity of citizenship because the Plaintiff and Defendant, Affinity are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

29.     More specifically, the Plaintiff is the personal representative of a testamentary estate formed under the laws of the Commonwealth of Virginia, and she too is individually a citizen and resident of the Commonwealth of Virginia, while Defendant, Affinity is a citizen of the Commonwealth of Pennsylvania.

30.     Venue is appropriate in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### IV.     Facts Common to All Causes of Action

31.     Plaintiff incorporates herein by reference the preceding paragraphs as though the

same were fully set forth at length herein.

32.     Jewel Fletcher Huff (hereinafter, "Ms. Huff") was admitted as a resident to Indian Haven on October 4, 2021.

33.     Prior to her admission to Indian Haven, Ms. Huff briefly stayed at a personal care home until September 30, 2021, when she was transferred to Indiana Regional Medical Center.

34.     At Indiana Regional Medical Center it was determined that Ms. Huff had fractured her right hip secondary to a likely fall at the personal care home.

35.     Thereafter, Ms. Huff was admitted to Indiana Regional Medical Center and underwent an open reduction and internal fixation (ORIF) surgical repair of her fractured right hip.

36.     After surgery and recovery at Indiana Regional Medical Center, Ms. Huff was discharged to Indian Haven for post-acute care and skilled rehabilitation.

37.     Ms. Huff's admission to Indian Haven was considered a short-term admission with the goal of discharge to her daughter's home.

38.     At the time of her admission to Indian Haven, Ms. Huff was described by the staff as alert, but oriented to person only, incontinent of bladder and required maximum assistance with personal care.

39.     During her admission to Indian Haven, Ms. Huff was vulnerable to suffering additional falls due to her gait disturbance and cognitive impairment.

40.     During her admission to Indian Haven, Ms. Huff required close monitoring and supervision for safety and to ensure she did not endure additional falls.

41.     The Defendants knew or should have known that Ms. Huff was at a high risk of falls with injury as evidenced by a recent fall with fracture, in addition to Ms. Huff's prescribed use anticoagulant medication, which could cause excessive bleeding in the event of a fall.

42.     On admission, Ms. Huff was ordered to received skilled therapies, both physical

and occupational, six times a week for four weeks.

43.    An initial physical therapy (PT) assessment identified Ms. Huff's need for therapy due a decline in functional abilities.

44.    During her residency, therapy noted Ms. Huff exhibiting signs of confusion and she was observed ambulating unassisted in her room without support, including use of her front wheeled walker.

45.    Per Ms. Huff's records, therapy staff informed the nursing staff of this unsafe situation, placing nursing on notice that Ms. Huff was known to be ambulating unassisted by staff and without her walker.

46.    Nevertheless, subsequent medical record entries reveal that Ms. Huff was found again and again walking by herself, without assistance, after the nursing staff was previously informed of this dangerous situation.

47.    Throughout her residency, Ms. Huff exhibited a continued need for supervision to ambulate safely and displayed an inability to utilize Indian Haven's call bell/call light system to call and wait for staff assistance.

48.    Due to Ms. Huff's known cognitive limitations, the Defendants' reminders to Ms. Huff to utilize her call bell and wait for staff were ineffective at limiting Ms. Huff's risk for suffering falls with injury.

49.    The Defendants were on notice of Ms. Huff's poor safety awareness and reluctance to utilize their call bell system to ask for assistance before ambulating on her own.

50.    Despite this awareness, the Defendants failed to provide sufficient nurse and nurse's aide staff, both in training and in number, to anticipate Ms. Huff's needs and supervise her while ambulating.

51.    Despite a documented pattern of unsafe ambulation, nursing staff consistently failed to respond appropriately to ensure that Ms. Huff received adequate assistance and

supervision to mitigate the occurrence of accidents, incidents and falls.

52.    Ms. Huff was deprived of a Comprehensive Person-Center Care Plan under 42 C.F.R. § 483.21.

53.    Ms. Huff's "initial" baseline care plan was incomplete, inaccurate and failed to address Ms. Huff's actual risk points and care needs.

54.    A cursory review of Ms. Huff's "initial" baseline care plan reveals generic, off-the-shelf interventions that did not accurately reflect Ms. Huff's needs and risks.

55.    For instance, Ms. Huff's initial baseline care plan mentions her anticoagulation medication but only instructs staff to conduct "Labs/Meds as ordered" and fails to instruct staff to "monitor for signs and symptoms of bleeding" and that Ms. Huff should be "protect[ed] from injury-safety measures."

56.    Moreover, Ms. Huff's "initial" care plan related to "Fall/Safety Risk" lists the generic goal of "no injuries" and also fails to mention Ms. Huff's known poor safety awareness and declining cognition, which are key factors in assessing fall risk as well as the feasibility of interventions to "encourage to use call bell" and to "instruct on safety measures."

57.    In fact, Ms. Huff's "initial" care did not assess or require any interventions under the "Cognitive Decline" section of the care plan.

58.    When the Indian Haven staff did conduct an "Interdisciplinary Care Plan Review" they did not add specific additional fall interventions that took into account Ms. Huff's cognitive limitations and poor safety awareness. The Review simply states that "fall precautions in place" without listing a single fall precaution being utilized.

59.    The  Indian Haven care team failed to develop fall precautions and implement interventions that were consistent with Ms. Huff's needs, goals and the current standards of practice, in order to reduce Ms. Huff's risk of accidents and falls.

60.    Ms. Huff was deprived of a comprehensive care plan which took into account her

individualized fall risk factors and implemented interventions to mitigate those risks, including the falls risks posed by incontinence, altered gait, declining cognition, anticoagulant medications and narcotic pain medications.

61.     Ms. Huff was deprived of timely monitoring of the effectiveness of her fall risk interventions.

62.     Ms. Huff was deprived of timely modifications and changes to her fall risk interventions to account for noted deficiencies in her existing plan of care, including the specious reliance on repetitive instruction to Ms. Huff to call for assistance with the Indian Haven call bell system prior to getting up on her own.

63.     Ms. Huff was deprived of an adequate assistive device for safety, including her front wheeled walker, to ambulate safely in her room.

64.     Ms. Huff was deprived of bed and chair alarms to timely alert staff to attempts to transfer and ambulate without staff assistance or use of her walker.

65.     Ms. Huff was deprived of a low bed and fall mats to decrease the risk of injury in the event a fall did occur.

66.     Ms. Huff was deprived of a care plan that accounted for the added injury risk of a fall and uncontrolled bleeding while receiving an anti-coagulation medication.

67.     Ms. Huff was deprived of frequent safety checks and a toileting schedule despite knowledge that she would consistently attempt to self-transfer and ambulate without waiting for staff assistance.

68.     Against this backdrop, Ms. Huff suffered an unwitnessed fall and was found on the floor in her room on October 17, 2021.

69.     The nursing note describing this fall indicates that Ms. Huff was found on the floor at the foot of her bed completely naked.

70.     Ms. Huff was noted to have a 3cm x 6cm hematoma to the left side of her forehead

and a purpura area on her left shoulder.

71.     There was no documentation regarding why Ms. Huff had removed her nightwear or whether it was wet, which would indicate an incontinence episode while trying to go to the bathroom.

72.     Subsequent documented entries reveal the lack of a thorough assessment of Ms. Huff's post-fall clinical status, other than the observation of the facial injury and a notation that she could move all extremities.

73.     There is no documentation in Ms. Huff's nurse's notes that her anti-coagulation medication was held after her fall, even though there was evidence of a head injury.

74.     In fact, Ms. Huff's records reveal that staff continued to provide Ms. Huff with anti-coagulant/blood thinner medication hours after her fall and known head injury.

75.     According to the records, neuro checks were implemented due to Ms. Huff's potential head injury, but the documentation of the same is questionable given redundant and identical entries at multiple times throughout the night.

76.     In fact, the neuro check vital signs notated at 2:18 a.m. after the fall were actually taken the evening before at 10:51 p.m. as evidenced by timed entries on the Weights and Vitals Summary Documentation in Ms. Huff's chart.

77.     After her fall on October 17, 2021, Ms. Huff endured a roughly fifteen (15) hour long delay before the physician was notified of Ms. Huff's fall.

78.     At 4:33 p.m. on October 17, 2021, a nurse's note states that Ms. Huff was complaining of left femur pain with a gait that was slower and more unsteady than usual, but "no obvious injury was noted."

79.     The physician still ordered a left hip x-ray.

80.    At 5:47 p.m. on October 17, 2021, a nurse completed a SBAR[1] but only noted Ms. Huff's decreased mobility with a possible fractured left femur. The SBAR does not mention the potential for an internal bleed as a result of a fall with an obvious head injury while taking a daily anti-coagulant/blood thinner.

81.    A nursing entry around the same time revealed that Ms. Huff's x-ray was positive for an acute, impacted, sub capital fracture of the neck of the left femur as a result of the fall she suffered hours earlier.

82.    The physician receiving this report directed staff to send Ms. Huff to the emergency department at Indiana Regional Medical Center.

83.    Ms. Huff arrived at the emergency room roughly 18 (eighteen) hours after she fell while under the care of the Defendants.

84.    Emergency room documentation revealed that Ms. Huff was confused and in pain that was severe at times, as well as having a large facial contusion.

85.    Diagnostic tests at the emergency room confirmed Ms. Huff's left femur fracture.

86.    Additionally, a CT scan of Ms. Huff's brain also revealed that Ms. Huff was also suffering from an intracranial bleed as a result of her fall.

87.    Further, Ms. Huff was also found to be suffering from a urinary tract infection (UTI) which had been unrecognized and undiagnosed at Indian Haven.

88.    Due to multiple traumas, including her life threatening head injury, the Indiana Regional Medical Center staff determined that Ms. Huff required access to trauma surgery and a neurosurgeon.

89.    Accordingly, Ms. Huff was transferred to Allegheny General Hospital (AGH) in Pittsburgh to access such services and arrived at the AGH emergency room at 11:41 p.m., nearly

---

[1] A SBAR is an assessment tool that stands for "Situation, Background, Assessment, Recommendations." It is utilized by nursing as a method of communication to inform the physician of patient-specific information.

twenty-two (22) hours after her fall at Indian Haven.

90.    Once at AGH, a repeat head CT identified swelling of the left frontal bone without fracture, scattered sub-arachnoid hemorrhages, hemorrhagic contusions in the parietal and right occipital lobes, local mass effect, and left frontal convexity subdural hygroma.

91.    Further imaging also revealed that Ms. Huff sustained a T12 burst fracture of her vertebrae that extended to the posterior cortex with a 3mm bony retropulsion, as well as subacute sacral vertebra fracture through S4 and surrounding callus.

92.    A summary from Ms. Huff's emergency room physician at AGH states that Ms. Huff sustained multi-system trauma including trauma to the head, spine and extremities and there was evidence of multicompartmental hemorrhage within Ms. Huff's brain, a burst fracture a the T12 vertebrae and a fractured left hip. All from one fall at Indian Haven.

93.     Given these significant diagnoses, Ms. Huff was admitted to the trauma ICU at AGH.

94.    At AGH, attempts to reverse Ms. Huff's brain bleed were unsuccessful and the family was informed that Ms. Huff was not a candidate for surgery.

95.    Given Ms. Huff's grim prognosis, and after conferring with Ms. Huff's family for several hours, it was determined that conservative, non-operative treatment would be best and hospice was ordered.

96.    Ms. Huff died on October 24, 2021.

97.    Ms. Huff's cause of death was determined to be blunt force trauma of head from a ground level fall .

## COUNT I

### Deprivation of Civil Rights Enforceable Via 42 U.S.C. § 1983- SURVIVAL

**Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased,**

**v.**

**Indiana County, Pennsylvania and The Communities at Indian Haven, Inc.**

98.     All of the preceding paragraphs of the within Complaint are incorporated herein as if set forth more fully at length.

99.     At all times relevant to this Complaint, Defendant Indian Haven was acting under the color of state law and as an agent of the Commonwealth of Pennsylvania.

100.     Defendant Indian Haven is bound generally by the Omnibus Budget Reconciliation Act of 1987 ("OBRA") and the Federal Nursing Home Reform Act ("FNHRA") which was contained within the OBRA. *See*, 42 U.S.C. § 1396r, 42 U.S.C. § 1396(a)(w), as incorporated by 42 U.S.C. § 1396r.

101.     Defendant Indian Haven is also bound generally by OBRA/FNHRA implementing regulations found at 42 C.F.R. §483, *et seq.*, which served to define and amplify specific statutory rights set forth in the above-mentioned statutes.

102.     The statutes in question, as amplified and further defined by the detailed regulatory provisions, create rights which are enforceable pursuant to 42 U.S.C. § 1983, as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

103.     Defendant Indian Haven, in derogation of the above statutes and regulations, and as a custom and policy, failed to comply with the aforementioned regulations, as follows:

    a.     By failing, as a custom and policy, to develop and implement written Policies and Procedures that prohibited the mistreatment, deliberate indifference, and abuse of residents such as Jewel Fletcher Huff, as required by 42 C.F.R. §483.12 and 42 U.S.C. §1396r(b)(1)(A);

    b.     By failing, as a custom and policy, to care for patients, including Jewel Fletcher Huff, in a manner that promoted maintenance or enhancement of her life, as required by 42 C.F.R. § 483.15 and 42 U.S.C. § 1396r(b)(1)(A);

c.      By failing, as a custom and policy, to promote the care of residents, including Jewel Fletcher Huff, in a manner and in an environment that maintained or enhanced her dignity, as required by 42 C.F.R. § 483.15 and 42 U.S.C. § 1396r(b)(1)(A);

d.      By failing, as a custom and policy, to develop a comprehensive Care Plan and assessment for residents, including Jewel Fletcher Huff, as required by 42 C.F.R. § 483.20 and 42 U.S.C. § 1396r(b)(2)(A);

e.      By failing, as a custom and policy, to provide residents, including Jewel Fletcher Huff, the necessary care and services to allow her§ to attain or maintain the highest practicable physical, mental and psycho-social wellbeing, as required by 42 C.F.R. § 483.25 and 42 U.S.C. § 1396r(b)(3)(A);

f.      By failing, as a custom and policy, to periodically review and revise a patient's or resident's written Plan of Care, including for Jewel Fletcher Huff, by an interdisciplinary team after each of the resident's or patient's assessments, as described by 42 U.S.C. § 1396r(b)(3)(A), as required by 42 U.S.C. § 1396r(b)(2)(C);

g.      By failing, as a custom and policy, to conduct an assessment of a patient or resident, including Jewel Fletcher Huff, as required by 42 U.S.C. § 1396r(b)(3)(A), promptly after a significant change in the resident's physical or mental condition, as required by 42 U.S.C. § 1396r(b)(3)(C)(i)(ii);

h.      By failing, as a custom and policy, to use the results of the assessments required as described above in developing, reviewing and revising Jewel Fletcher Huff's Plan of Care, as required by 42 U.S.C. § 1396r(b)(3)(D);

i.      By failing, as a custom and policy, to ensure that patients or residents, including Jewel Fletcher Huff, were provided medically related social services to attain or maintain the highest practicable physical, mental and psycho-social wellbeing, as required by 42 C.F.R. § 483.25 and 42 U.S.C. § 1396r(b)(4)(ii);

j.      By failing, as a custom and policy, to ensure that an ongoing program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental and psycho-social wellbeing of each resident or patient, including Jewel Fletcher Huff, was implemented,

14

as required by 42 C.F.R. § 483.25 and 42 U.S.C. § 1396r(b)(4)(A)(v);

k.    By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents was properly certified and/or re-certified as being qualified to perform necessary nursing services, as required by 42 U.S.C. § 1396r(b)(4)(B);

l.    By failing, as a custom and policy, to provide sufficient nursing staff to provide nursing and related services that would allow patients or residents, including Jewel Fletcher Huff, to attain or maintain the highest practicable physical, mental and psycho-social well-being, as required by 42 C.F.R. § 483.30 and 42 U.S.C. § 1396r(b)(4)(C);

m.    By failing, as a custom and policy, to maintain clinical records on all residents, including Jewel Fletcher Huff, including but not limited to the Plans of Care and resident's risk assessments, as required by 42 U.S.C. § 1396r(b)(6)(C);

n.    By failing, as a custom and policy, to ensure that Indian Haven was administered in a manner that enabled it to use its resources effectively and efficiently to allow patients or residents, including Jewel Fletcher Huff, to attain or maintain their highest practicable level of physical, mental and psycho- social wellbeing, as required by 42 C.F.R. § 483.75, 42 U.S.C. § 1396r(d)(A) and 42 U.S.C. § 1396r(d)(A) and 42 U.S.C. § 1396r(d)(1)(C);

o.    By failing, as a custom and policy, to ensure that the administrator of Indian Haven met the standards established under 42 U.S.C. § 1396r(f)(4), as required by 42 U.S.C. § 1396r(d)(1)(C);

p.    By failing, as a custom and policy, to ensure that Indian Haven was complying with the federal, state, local laws and accepted professional standards which apply to professionals providing services to residents, including Jewel Fletcher Huff, and in operating such a facility as Indian Haven, as required by 42 U.S.C. § 1396r(d)(4)(A);

q.    By failing, as a custom and policy, to ensure that Indian Haven's administrator and director of nursing properly monitored and supervised subordinate staff, thereby failing to ensure the health and safety of residents or patients, including Jewel Fletcher Huff, in derogation of

42 C.F.R. § 483.75 and 42 U.S.C. § 1396r(a)(W); and,

r.   By failing, as a custom and policy, to ensure Indian Haven had an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable disease and infections as required by 42 CFR § 483.80 and 42 U.S.C. § 1396r(d)(3).

104.   As a proximate result of Defendant Indian Haven's actionable derogation of its regulatory and statutory responsibilities as above-described, Jewel Fletcher Huff was injured as previously referenced and suffered pain, distress, and death as a result of Defendant Indian Haven's poor care and treatment, which allowed her to suffer harm as described herein.

105.   As such, Plaintiff has suffered, and is entitled to recover the following damages, as well as an award of reasonable counsel fees, pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988:

a.   Pain, suffering, inconvenience, anxiety and nervousness of Jewel Fletcher Huff until the time of her death;

b.   Hospital, medical, surgical and nursing expenses incurred on Jewel Fletcher Huff's behalf;

c.   Other losses and damages permitted by law; and,

d.   Any other damages as the Court sees fit to award.

WHEREFORE, Plaintiff Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased, demands compensatory damages from Defendants, Indiana County, Pennsylvania, as owner and operator of The Communities at Indian Haven, and The Communities of Indian Haven, Inc., in excess of Seventy-Five Thousand Dollars $75,000.00, plus interest, costs of suit and attorneys' fees.

16

## COUNT II

## Deprivation of Civil Rights Enforceable Via 42 U.S.C. § 1983- WRONGFUL DEATH

**Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased,**
**v.**
**Indiana County, Pennsylvania and The Communities at Indian Haven, Inc.**

106.    All of the proceeding Paragraphs of this Complaint are incorporated herein, as if set forth more fully at length.

107.    As a proximate result of Defendant Indian Haven's actionable derogation of its regulatory and statutory responsibilities as above-described, Jewel Fletcher Huff was injured as previously referenced, and suffered pain, distress and death as a result of the poor care and treatment that she received before dying on October 24, 2021.

108.    As such, Plaintiff has suffered, and is entitled to recover the following damages, as well as an award of reasonable counsel fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988:

      a.    Money for surgical, nursing and hospital expenses related to the death of Jewel Fletcher Huff;

      b.    Money for funeral and estate expenses because of the death of Jewel Fletcher Huff;

      c.    Damages for the lost services, assistance, guidance, counseling, and companionship of Jewel Fletcher Huff;

      d.    Financial support and all pecuniary benefits which they would have received from Jewel Fletcher Huff;

      e.    The expenses of administration; and,

      f.    Other losses and damages permitted by law.

WHEREFORE, Plaintiff, Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased, demands compensatory damages from Defendants, Indiana County, Pennsylvania, as owner and operator of The Communities at Indian Haven, and The Communities of Indian Haven, Inc., in excess of Seventy-Five Thousand Dollars $75,000.00, plus interest, costs of suit and attorneys' fees.

## COUNT III

### Negligence -- Survival Action Pursuant to 42 Pa.C.S. §8302

**Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased**
**v.**
**Affinity Health Services, Inc.**

109.    All of the proceeding Paragraphs of this Complaint are incorporated herein, as if set forth more fully at length.

110.    Plaintiff brings this survival action pursuant to 42 Pa.C.S. §8302 against co-Defendant, Affinity Health Services, Inc. (hereinafter "Affinity") for its negligent, careless and reckless management of the operations of Indian Haven during Ms. Huff's residency there.

111.    At all times material hereto, Affinity was the manager of Indian Haven, hiring and employing the licensed nursing home administrator of Indian Haven as well as Indian Haven's director of nursing, and finance director.

112.    At all times material hereto, Affinity managed the operations of Indian Haven and was required to directly supervise, manage and provide technical assistance in the areas of fiscal management and administration, nursing services to residents, finance and accounting, dietary services, social services, marketing and admissions.

113.    At all times material hereto, Affinity was required to analyze departmental operations and provide problem resolution and planning by department, including the conduct of mock surveys and quality assurance functions related to clinical and regulatory compliance.

114. Affinity was responsible for the preparation of the written annual operating budget for Indian Haven which governed the facility's expenditures and resource utilization.

115. Further, Affinity handled personnel, salary determinations and general human resources for Indian Haven, including staff training.

116. As part of its duties and responsibilities, Affinity had an obligation to maintain and manage Indian Haven with adequate staff and sufficient resources to ensure timely recognition and appropriate treatment of the medical, nursing and/or custodial needs of the residents, including Ms. Huff.

117. Affinity also had the duty to employ competent, qualified and trained staff, and to continuously evaluate the performance of the same, to ensure that the staff was providing care consistent with the regulations and each resident's plan of care.

118. Affinity also had an obligation to ensure that Indian Haven's nursing services polices, procedures, assessments and care planning processes satisfied the applicable regulations and industry standards.

119. Affinity failed to provide the resources necessary, including sufficient staff in both number and training, to meet the needs of the residents, including Ms. Huff.

120. Affinity also failed to adopt and enforce adequate nursing policies and procedures, including in the areas of care planning, fall prevention, fall aftercare, recognition and response to changes in resident condition and emergency care.

121. Upon her admission to Indian Haven and during the relevant time period, Ms. Huff was dependent upon the staff for her physical, mental, psycho-social, medical, nursing and custodial needs, requiring extensive assistance with activities of daily living.

122. Upon her admission, Ms. Huff was also at risk for future illnesses and injuries; most notably, she at high risk for falling and suffering significant injury due her use of anti-coagulant

medications and her recent history of falling and suffering a right hip fracture.

123.    During all times material hereto, Affinity authored, produced and/or received frequent reports detailing the number and types of injuries, illnesses and infections that were sustained by Indian Haven's residents, including the occurrence of falls.

124.    Despite being made aware of these types and frequencies of incidents and injuries, many of which were preventable, Affinity failed to take steps to prevent the occurrence of the same, resulting injury to Ms. Huff.

125.    Moreover, Affinity knew, through actual notice of governmental and mock surveys, that Indian Haven was not in compliance with its regulatory obligations in numerous respects, yet Affinity failed to remedy the same, resulting in injury to Ms. Huff.

126.    During all times material hereto, Affinity engaged in a pattern of care replete with harmful and injurious commissions, omissions and neglect as described herein, depriving Ms. Huff of adequate and appropriate care services and resulting in a catastrophic fall, left hip fracture, traumatic subarachnoid hemorrhage, subdural hematoma, T12 burst fracture, delays in treatment and discharge to a higher level of care, urinary tract infection and ultimately, death.

127.    The aforementioned incidents and injuries were caused by the willful misconduct, actual malice, carelessness, recklessness and negligence of Affinity, acting individually, and also by and through its employees, servants, agents, ostensible agents and work persons and consisted of the following:

    a.    Physical neglect of Ms. Huff;

    b.    Failure to properly supervise, monitor, observe and assess Ms. Huff's condition and the services she was receiving at Indian Haven;

    c.    Failure to provide sufficient personnel in number and training to adequately assess and care plan for fall risks;

    d.    Failure to develop adequate policies and procedures with

regard to resident care planning, including in the area of fall risk interventions and required updates to fall risk interventions when existing methods are not working;

e.  Failure to enforce adequate policies and procedures with regard to resident care planning, including in the area of fall risk interventions and required updates to fall risk interventions when existing methods are not working;

f.  Failure to develop adequate policies and procedures with regard to responding to resident falls when a resident is prescribed an anti-coagulant medication;

g.  Failure to enforce adequate policies and procedures with regard to responding to resident falls when a resident is prescribed an anti-coagulant medication;

h.  Failure to immediately discontinue administration of Ms. Huff's anti-coagulation medication after she was found on the floor in her room on October 17, 2021;

i.  Failure to immediately send Ms. Huff to the hospital after she was found on the floor in her room on October 17, 2021;

j.  Failure to develop adequate policies and procedures with regard to responding to and assessing residents' changes in condition and reporting the same to a physician in a timely fashion;

k.  Failure to enforce adequate policies and procedures with regard to responding to and assessing residents' changes in condition and reporting the same to a physician in a timely fashion;

l.  Failure to ensure cross-departmental communication and compliance related to recommendations for resident care, including communications between the therapy and nursing departments;

m.  Failure to appropriately monitor and report Ms. Huff's clinical condition;

n.  Failure to identify and treat Ms. Huff's urinary tract infection;

o.    Failure to transfer Ms. Huff to the hospital for emergent care in a timely fashion;

p.    Failure to timely advise Ms. Huff's family members of her change in condition;

q.    Failure to ensure that sufficient staff were available to meet Ms. Huff's needs and provide nursing and related services to attain or maintain her highest practicable physical, mental and psychosocial well-being;

r.    Failure to hire and train appropriate and competent medical and nursing personnel to properly monitor, supervise and/or treat Ms. Huff's medical condition;

s.    Failure to hire a sufficient number of trained and competent medical personnel who knew how to meet the needs of Ms. Huff;

t.    Ongoing retention of and assignment of unfit, unqualified and/or untrained medical and nursing personnel who caused harm to Ms. Huff;

u.    Ongoing failure to provide sufficient numbers of staff to meet Ms. Huff's fundamental care needs, including adequate supervision to prevent her from suffering unwitnessed falls;

v.    Failure to adequately care plan for Ms. Huff's fall risk, including the failure to utilize fall interventions such as alarms, routine and regular checks, fall mats and a low bed;

w.    Failure to place Ms. Huff on a regular toileting program to anticipate her needs and intervene before she would transfer and ambulate without waiting for assistance;

x.    Failure to use reasonable care in the maintenance of safe and adequate facilities and equipment;

y.    Failure to maintain sufficient funding, staffing and resources so that Indian Haven's residents were provided with the care and services they required;

z.    Failure to formulate, adopt and enforce rules, procedures and policies to ensure quality of care for all residents, and

to update the same as required by the applicable standards of care; and

aa.    Failure to provide a safe, decent and clean living environment for Indian Haven's residents.

128.    As a direct and proximate result of Affinity's negligence, carelessness and recklessness, Ms. Huff was caused to endure significant pain, suffering, distress, and mental anguish up until her death on October 24, 2021.

129.    Plaintiff claims damages for the conscious pain and suffering, including mental and physical pain, suffering and inconvenience, loss of life's pleasures and aggravation of pre-existing medical conditions, and expense of otherwise unnecessary hospitalizations undergone by Jewel Fletcher Huff, up to and including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness and recklessness.

130.    Plaintiff claims damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental injuries, physical injuries endured by Jewel Fletcher Huff, including the catastrophic fall which resulted in a left hip fracture, traumatic subarachnoid hemorrhage, subdural hematoma, T12 burst fracture, delays in treatment and discharge to a higher level of care, as well as an undiscovered urinary tract infection and ultimately, death.

131.    In causing and contributing to the aforementioned injuries, the Affinity knew, or should have known, that Jewel Fletcher Huff would suffer such harm.

132.    The conduct of Affinity was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health and well-being of Jewel Fletcher Huff.

133.    The conduct of Affinity was such that an award of punitive damages is justified.

WHEREFORE, Plaintiff, Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased, demands compensatory damages from Defendant, Affinity Health Services, Inc., in excess of Seventy-Five Thousand Dollars $75,000.00, plus interest, costs of suit and any other

relief available under the law and equity as this Court deems just and appropriate.

## COUNT IV

### Negligence - Wrongful Death Pursuant to 42 Pa.C.S. §8301

**Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased**
**v.**
**Affinity Health Services, Inc.**

134.    All of the proceeding Paragraphs of this Complaint are incorporated herein, as if set forth more fully at length.

135.    Plaintiff brings this wrongful action pursuant to 42 Pa.C.S. §8301 against co-Defendant, Affinity for its negligent, careless and reckless management of the operations of Indian Haven during Ms. Huff's residency there, which resulted in her death on October 24, 2021.

136.    The background relationship amongst the parties and Affinity's role in relation to Indian Haven is set forth in the previous Count (Count III) and said allegations are incorporated herein by reference as if set more fully at length.

137.    The aforementioned incidents, injuries and wrongful death of Ms. Huff was caused by the carelessness, recklessness and negligence of Affinity, acting individually, and also by and through its employees, servants, agents, ostensible agents and work persons and consisted of the following:

      a.      Physical neglect of Ms. Huff;

      b.      Failure to properly supervise, monitor, observe and assess Ms. Huff's condition and the services she was receiving at Indian Haven;

      c.      Failure to provide sufficient personnel in number and training to adequately assess and care plan for fall risks;

      d.      Failure to develop adequate policies and procedures with regard to resident care planning, including in the area of fall risk interventions and required updates to fall risk interventions when existing methods are not working;

e.   Failure to enforce adequate policies and procedures with regard to resident care planning, including in the area of fall risk interventions and required updates to fall risk interventions when existing methods are not working;

f.   Failure to develop adequate policies and procedures with regard to responding to resident falls when a resident is prescribed an anti-coagulant medication;

g.   Failure to enforce adequate policies and procedures with regard to responding to resident falls when a resident is prescribed an anti-coagulant medication;

h.   Failure to immediately discontinue administration of Ms. Huff's anti-coagulation medication after she was found on the floor in her room on October 17, 2021;

i.   Failure to immediately send Ms. Huff to the hospital after she was found on the floor in her room on October 17, 2021;

j.   Failure to develop adequate policies and procedures with regard to responding to and assessing residents' changes in condition and reporting the same to a physician in a timely fashion;

k.   Failure to enforce adequate policies and procedures with regard to responding to and assessing residents' changes in condition and reporting the same to a physician in a timely fashion;

l.   Failure to ensure cross-departmental communication and compliance related to recommendations for resident care, including communications between the therapy and nursing departments;

m.   Failure to appropriately monitor and report Ms. Huff's clinical condition;

n.   Failure to identify and treat Ms. Huff's urinary tract infection;

o.   Failure to transfer Ms. Huff to the hospital for emergent care in a timely fashion;

p.      Failure to timely advise Ms. Huff's family members of her change in condition;

q.      Failure to ensure that sufficient staff were available to meet Ms. Huff's needs and provide nursing and related services to attain or maintain her highest practicable physical, mental and psychosocial well-being;

r.      Failure to hire and train appropriate and competent medical and nursing personnel to properly monitor, supervise and/or treat Ms. Huff's medical condition;

s.      Failure to hire a sufficient number of trained and competent medical personnel who knew how to meet the needs of Ms. Huff;

t.      Ongoing retention of and assignment of unfit, unqualified and/or untrained medical and nursing personnel who caused harm to Ms. Huff;

u.      Ongoing failure to provide sufficient numbers of staff to meet Ms. Huff's fundamental care needs, including adequate supervision to prevent her from suffering unwitnessed falls;

v.      Failure to adequately care plan for Ms. Huff's fall risk, including the failure to utilize fall interventions such as alarms, routine and regular checks, fall mats and a low bed;

w.      Failure to place Ms. Huff on a regular toileting program to anticipate her needs and intervene before she would transfer and ambulate without waiting for assistance;

x.      Failure to use reasonable care in the maintenance of safe and adequate facilities and equipment;

y.      Failure to maintain sufficient funding, staffing and resources so that Indian Haven's residents were provided with the care and services they required;

z.      Failure to formulate, adopt and enforce rules, procedures and policies to ensure quality of care for all residents, and to update the same as required by the applicable standards of care; and

aa.     Failure to provide a safe, decent and clean living environment for Indian Haven's residents.

138.    As a direct and proximate result of Affinity's negligence, carelessness and recklessness, Ms. Huff was caused to suffer a wrongful death on October 24, 2021.

139.    As a direct and proximate result of Affinity's negligence, carelessness and recklessness of Affinity resulting in the death of Ms. Huff, the beneficiaries listed above were caused to suffer pecuniary loss and the deprivation of the companionship, comfort, aid, assistance and society that they would have received by Jewel Fletcher Huff for the remainder of her natural life.

140.    Further, Plaintiff seeks damages for reimbursement of hospital, nursing, medical and funeral expenses, together with expenses of administration and any other expenses incurred in connection therewith.

WHEREFORE, Plaintiff, Jewel Lee Doherty, as Executor of the Estate of Jewel Fletcher Huff, deceased, demands compensatory damages from Defendant, Affinity Health Services, Inc., in excess of Seventy-Five Thousand Dollars $75,000.00, plus interest, costs of suit and any other relief available under the law and equity as this Court deems just and appropriate.

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted,

Dated:  October 12, 2023          BY:     /s/ Colin M. Esgro
                                          Colin M. Esgro, Esquire
                                          Pennsylvania Attorney ID No. 316947
                                          **MURRAY, STONE & WILSON, PLLC**
                                          The Grant Building
                                          310 Grant Street, Suite 1123
                                          Pittsburgh, PA 15219
                                          Telephone:  412-516-6000
                                          Facsimile:  610-467-2881
                                          Email:  cesgro@mswlawgroup.com